MARTIN CAREY *vs.* ARLINGTON MILLS.

Essex.    November 10, 1888. — January 4, 1889.

Present: MORTON, C. J., FIELD, DEVENS, C. ALLEN, & KNOWLTON, JJ.

*Personal Injuries — Elevator Well — Negligence — Due Care.*

A boy about fifteen years old was injured, while employed at night in a mill, by falling into the well of a freight elevator. At the trial of an action to recover for such injuries, there was evidence that the well was guarded by hatches, self-closing as the elevator passed up and down; that the well was so lighted from a room adjoining it that the floor formed over the well by the closed hatches, or the well itself if they were open, could be seen but a short distance from within the room, and that, if the elevator was at that floor, only the front of its platform could be seen; that he knew how the hatches worked, but did not know that they were not in working order at the time; that, as he approached the entrance to the well from that room as usual with a loaded truck to use the elevator, he saw one of the hatches standing up against the wall of the well, and

knew that they were open, and inferred from this that the elevator was at that floor; and that, thinking that the platform might be slightly raised above the floor, as sometimes it was, he pushed the truck through the entrance on the run, and, the elevator being at the floor above, he fell and was injured. *Held,* that there was evidence for the jury that the boy was in the exercise of due care.

TORT for personal injuries occasioned to the plaintiff by falling down an elevator well in a mill while in the defendant's employment. Trial in the Superior Court, before *Lathrop,* J., who allowed a bill of exceptions, which, so far as material, was as follows.

On the issue as to whether the plaintiff was in the exercise of due care, evidence was introduced tending to prove the following facts. The plaintiff at the time of the accident, which occurred during the night of August 25–26, 1887, was not quite fifteen years of age. On or about July 4, 1887, the plaintiff, who previously had been employed by the defendant during the day, entered upon night work in the drawing-room of its mill. His duties consisted in tending a machine known as a drawing-frame, and in conveying bobbins of yarn on trucks from the machine to an elevator in the drawing-room, and thence by means of the elevator to the floor below, where he emptied the trucks and returned by the same elevator to the floor of the drawing-room. The well of this elevator was guarded by a railing, which was raised and lowered by the person in charge of it. During the two nights before the night of the accident the plaintiff was directed by his overseer for the first time to use another elevator, situated in the combing-room, which was on the same floor as the drawing-room, in carrying his trucks to the floor below. He had made two trips on this elevator on such two nights, and on the night of the accident he had made two trips before the one on which he was injured.

The mill of the defendant was a rectangular building running east and west, and this elevator was situated in an elevator well in a square tower with brick walls in the southeast corner of the building. An entrance was afforded to the elevator well from the floor of the combing-room through a doorway about five feet in width, and seven or eight feet in height, cut through the west wall of the tower. A long and unobstructed passageway between a row of machines in the combing-room and the

south wall of the building led up to this entrance to the well. The elevator consisted of a platform about six feet square, connected by two upright posts at opposite corners of the platform to a crossbeam, to which the hoisting rope was attached. There was apparatus above the crossbeam and beneath the platform for pushing open two self-closing hatches, operated by a lever and weights, which were designed to close the elevator well as the elevator ascended and descended. These hatches, which were triangular in shape, were divided at a line parallel to the crossbeam of the elevator, and in the same vertical plane, and when closed completely filled the elevator well.

When the elevator was at the floor of the combing-room, these hatches, having been raised by the apparatus, stood upright, one against the east wall, and the other against the north wall of the tower. The elevator was in charge of an elevator boy. At night the combing-room was lighted by arc electric lights, pendent from the ceiling, and the light nearest to the tower was so situated that the light entered the doorway leading to the well in such a way as to light only the front of the elevator platform, leaving the back of the platform and the top of the elevator in partial darkness. On every trip that the plaintiff had made by way of this elevator before the accident, he had seen, as he approached the entrance to the elevator well, the triangular hatch standing upright against the north wall of the well, but was unable to see the other hatch, or the elevator boy who stood on the back of the platform, or any other part of the elevator until he arrived close to it, but on each trip he had found the elevator in position at the level of the floor of the combing-room, had run on his truck, and descended to the floor below.

The plaintiff testified, that, at the time of the accident, as he approached the entrance to the elevator well along the passageway in the combing-room, he supposed the elevator was at that floor ; that he could just see the hatch standing up ; that he ran the truck into the well and went down ; and that he came up to the entrance with the truck on the run for the reason that "sometimes the elevator would be stopped a little bit higher than the floor, and I would have to run a little to get it on ; I could not get it on by walking, it was a heavy truck." It appeared in evidence, that at the time of the accident the elevator was at the

floor above the combing-room, and, the hatches being open, the plaintiff fell with the truck to the floor below, sustaining the injuries in question.

On cross-examination the plaintiff testified that, if he had stopped at the entrance to the elevator well and looked about him, he could have seen whether the elevator was in position there; that he was familiar with the running of the elevator. Knew that it ran up to the third story and down to the basement. Knew that if the trap-door was up, and there was no elevator at the landing, there was nothing to fill the elevator hole. The only trap-door I ever noticed was that on the north side of the tower, on the left of the entrance; when I ran the truck on the elevator the night before, I did not see that there were trap-doors up until I got on the elevator. . . . I knew what the trap-door or hatches were for, and might have seen whether they were working or not, if I had looked. . . . When I was about thirty feet from the elevator, I looked along the side of the truck and saw the trap-door up. I did not look again. As I came along, I kept my head down looking on the floor. I went pretty fast and ran right down."

One Early, a witness called by the plaintiff, testified that "the light from the large electric light poured right into the doorway, without obstruction; on the night of the accident, when the elevator was not at the landing, you could see the elevator hole in the floor of the elevator well twenty feet away, coming along the passageway."

One McCartney, another witness for the plaintiff, testified that, "as you came along the aisle at night-time, the frame-work of the elevator was visible through the doorway five or six feet away," and "you could see the elevator one hundred feet away in the daytime, and in the night-time as far as the light penetrated in."

One McElroy, also a witness for the plaintiff, testified that "fifty feet away from the elevator tower, at night, you could see the elevator inside the tower, and know it was at the landing. From that distance you could see one of the upright standards of the elevator about five inches thick, the cross-piece connecting the tops of the standards about six inches wide, and the iron-work above the elevator, which lifted the trap-door. . . . The

large electric light nearest the elevator door was burning at the time of the accident, and there was no obstruction to prevent the light from pouring into the elevator well. Immediately after the accident I talked with the plaintiff. I asked him how he came to go down through, and I said, ' Did n't you know the elevator was n't there?' and he said, ' No.' I said, ' Could n't you see that it was n't there?' He said he did n't look. He said the elevator had always been there, and he supposed it was there then, and he went to push his truck on and went down. He said the truck was kind of heavy, and that he was pushing it along with his hands on the truck and his head down."

It also appeared in evidence, that the lever which operated one of the hatches had been broken for four or five days before the accident, and for that reason during that period and at the time of the accident both hatches had been tied up and stood in the positions they would occupy when in working order with the elevator at the level of the floor. The plaintiff, however, testified that he did not know that the machinery which operated the hatches was out of repair, or that the hatches were not in working order.

Upon these facts, the judge ruled that there was not sufficient evidence of due care on the part of the plaintiff, and directed the jury to return a verdict for the defendant; and the plaintiff alleged exceptions.

*J. P. Sweeney,* for the plaintiff.

*C. A. De Courcy,* for the defendant.

FIELD, J. We think that there was evidence for the jury, that the plaintiff knew the manner in which the hatches worked, and did not know that they were not in working order at the time of the accident; that he saw one of them up against the wall, and knew that they were open, and inferred from this that the elevator was at the floor of the combing-room ; and that, relying upon this, he ran the truck rapidly in through the doorway of the elevator well, and fell through the hole. If he did not know that the hatches were out of order, it was reasonable that he should rely, to some extent, upon the fact that they were open ; because, if in working order, they would not be open unless some part of the elevator was in the hole. With reference to the amount of light in the elevator well on the night when

the accident happened, the distance from which the hole could be seen by the plaintiff if the elevator were not in it, the extent of the view which the plaintiff could take of the elevator if it were in the hole, and the propriety or necessity of running with the truck in order to push it upon the ·floor of the elevator, the evidence was not such that we can say that there was no evidence for the jury tending to prove that the plaintiff exercised that degree of care which should reasonably be required of a boy of his age, if he relied upon the open·hatches as a signal that the elevator was in position to receive the truck.

*Exceptions sustained.*